AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

### DISTRICT OF    OREGON

FILED'08 DEC 11 10-58USDC-ORP

### In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)
Heron Meadows Apartments, 4815 Unthank Avenue,
Apartment 388, Eugene, Oregon 97402; Blue 2005
Chevrolet Cavalier, bearing VIN 1G1JF52F857110139,
Oregon Lic D/2 0516; Nathaniel James Nicholson, white
male, height 5'8", approx 155 lbs, DOB 1984;
FCI Sheridan, Unit 4B, Cell 205L; 1699 North Terry Street,
Space 161, Eugene, Oregon 97402

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

Case Number: 08-MC - 9276 · A-E

I, _____ JARED J. GARTH _____ being duly sworn depose and say:

I am a(n) _____ FBI SPECIAL AGENT _____ and have reason to believe

                          Official Title

that ☑ on the person of or  ☑ on the property or premises known as (name, description and/or location)

more particularly described in Attachments A through E

in the _____ District of _____ Oregon

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachments 1, 2 & 3

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime

concerning a violation of Title ___18___ United States code, Section(s) ___951 & 1956___

The facts to support a finding of probable cause are as follows:

See Attached Affidavit of Special Agent Jared J. Garth

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

December 11, 2008
Date

at  Portland                    Oregon
    City                         State

_____
Signature of Judge

The Honorable Paul Papak        U.S. Magistrate Judge
Name of Judge                    Title of Judge

DISTRICT OF OREGON   )
            ) ss. AFFIDAVIT OF JARED J. GARTH
COUNTY OF MULTNOMAH )

I, Jared J. Garth, being duly sworn, depose and state:

## AGENT EXPERIENCE

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), United States

Department of Justice, and have been so employed for approximately eleven years. I am

currently assigned to the Portland Field Office of the FBI. I have completed FBI training in

foreign counterintelligence matters, which has included training in criminal violations associated

with espionage. From January 1998 to April 2003, I was assigned to the Counterintelligence

Division of the New York Field Office where my primary responsibility was the investigation of

matters involving foreign counterintelligence. This included investigating allegations of

potential espionage. Between April 2003, and April 2005, I was assigned as a Supervisory

Special Agent to the Counterintelligence Division of FBI Headquarters in Washington, D.C.,

where I managed counterintelligence investigations throughout the United States. During my

tenure as Special Agent in both New York and FBI Headquarters, I also worked with

representatives of other U.S. Intelligence Agencies. As a result of this training and experience, I

am familiar with tactics, methods, and techniques of foreign intelligence services and their

agents.

2. Although I am currently assigned as the Chief Division Counsel for the Portland

Field Office, I have been assigned as a co-case agent in the investigation of convicted spy

HAROLD JAMES NICHOLSON, currently in Bureau of Prisons' (BOP) custody at the Federal

Correctional Institution at Sheridan, Oregon, and his son NATHANIEL JAMES NICHOLSON, who resides in Eugene, Oregon. As described below, the evidence will establish that while serving a federal prison sentence for Conspiracy to Commit Espionage, HAROLD JAMES NICHOLSON has continued his illegal contact with a foreign government by utilizing his son NATHANIEL JAMES NICHOLSON to facilitate these contacts.

## PURPOSE OF AFFIDAVIT

3.      This affidavit is submitted in support of search warrants for the following locations, person and vehicle more particularly described in Attachments A through E:

A)      The residence of Nathaniel James Nicholson, located at Heron Meadows Apartments, 4815 Unthank Avenue, Apartment 388, Eugene, Oregon 97402.

B)       A Blue 2005 Chevrolet Cavalier, bearing Vehicle Identification Number 1G1JF52F857110139, Oregon License D/2 0516, registered to Nathaniel J. Nicholson, 4815 Unthank Avenue, Apartment 388, Eugene, Oregon 97402.

C)      The person of Nathaniel James Nicholson, who is a white male, height 5'8", approximately 155 lbs, date of birth July 31, 1984.

D)      Federal Correctional Institute, Sheridan, Oregon, Unit 4B, Cell 205L, occupied by Harold J. Nicholson and cellmate Kyle Minchey inmate # 12869-081.

E)      The residence of Marvin C. Nicholson and Beatrice M. Nicholson located at 1699 North Terry Street, Space 161, Eugene, Oregon 97402.

4.      There is probable cause to believe that NATHANIEL JAMES NICHOLSON (hereinafter NATHANIEL) and his father HAROLD JAMES NICHOLSON (hereinafter NICHOLSON) have committed violations of Title 18, United States Code, § 951, to knowingly

2

act in the United States as an agent of a foreign government, namely the Government of Russia, without the prior notification to the Attorney General of the United States, and Title 18, United States Code, § 1956(a) and (h), conspiracy to commit money laundering. At no time during the conduct alleged in this affidavit have NICHOLSON or NATHANIEL ever been (a) duly accredited diplomatic or consular officers of a foreign government, specifically Russia, recognized by the United States Department of State; (b) officially and publically acknowledged and sponsored officials or representatives of a foreign government, specifically Russia; or, (c) officially and publicly acknowledged and sponsored members of the staff of, or employees of, any such officer, official, or representative of a foreign government, specifically Russia. In addition, it is unlawful for a person to transport funds from a place outside the United States or to a place in the United States from or through a place outside the United States, with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. Proceeds received based upon espionage activities in violation of Title 18 U.S.C. § 794 is a specified unlawful activity as described in Title 18 U.S.C. § 1956.

5.      There is probable cause to believe that evidence of these violations more specifically described in Attachment 1 will be found in and on the premises, person and vehicle described in Attachments A through C. There is also probable cause to believe that evidence more specifically described in Attachment 2 will be found in and on the premises described in Attachment D. There is also probable cause to believe that evidence of money laundering described in Attachment 3 will be found in and on the premises described in Attachment E.

6.    I submit this affidavit based on my experience, background and personal knowledge derived from my participation in this investigation and based on reports and information conveyed to me (as described herein) by other FBI Special Agents, FBI Intelligence Analysts and representatives of the Central Intelligence Agency (CIA).  Because this affidavit is being submitted for the limited purpose of obtaining search warrants, I have not included each and every fact known to me concerning this investigation.  I have only set forth the facts that I believe are necessary to establish probable cause to believe that evidence of the above criminal activity will be found in and on the locations, person and vehicle described in Attachments A through E.

## BACKGROUND OF HAROLD JAMES NICHOLSON

7.    On November 16, 1996, NICHOLSON was arrested in the Eastern District of Virginia and charged with Conspiracy to Commit Espionage after a comprehensive investigation revealed that NICHOLSON had been spying for the Russian Federation from June of 1994 until his arrest.  At the time of his arrest, NICHOLSON was attempting to board a flight to Zurich, Switzerland, at Dulles International Airport.  NICHOLSON was carrying a significant amount of classified material that he intended to provide to an agent of the Russian Federation in Switzerland.

8.    On March 3, 1997, NICHOLSON pleaded guilty to Conspiracy to Commit Espionage, in violation of Title 18, United States Code, § 794(a) and (c).  As part of his plea, NICHOLSON admitted that between June 1994 and November 16, 1996, he provided the Russian Federation documents, photographic negatives and information relating to the national

4

defense of the United States, with the intent and reason to believe that the same would be used to the injury of the United States and to the advantage of the Russian Federation.

9.    From October 1980 until his arrest, NICHOLSON was an operations officer with the CIA. During his sixteen-year career with the CIA, NICHOLSON was assigned to posts throughout the world and at the CIA's headquarters in Langley, Virginia. NICHOLSON worked primarily as an operations officer specializing in intelligence operations against foreign intelligence services, including intelligence services of the USSR and later the Russian Federation, including the Sluzhba Vneshney Razvedki Rossii (SVRR).[1]

10.    From 1992 to 1994, NICHOLSON was the Deputy Chief of Station/Operations Officer in Kuala Lumpur, Malaysia, where he met with and targeted for recruitment Russian intelligence officers. From July 1994 to July 1996, NICHOLSON worked as an instructor at the CIA Special Training Center (STC) in northern Virginia teaching CIA trainees intelligence tradecraft. In July 1996, NICHOLSON was assigned as a Branch Chief in the Counterterrorism Center, Directorate of Operations, at CIA Headquarters in Langley, Virginia. Throughout his tenure at the CIA, NICHOLSON held a Top Secret security clearance and had continual access to classified information. Top Secret information is information that, if disclosed, could cause exceptionally grave damage to the United States.

11.    NICHOLSON met with agents of the SVRR on numerous occasions to provide them with classified national defense information. He met with agents of the SVRR in Kuala Lumpur, Malaysia, New Delhi, India, Indonesia, Switzerland and Singapore. In each overseas

---

[1] The SVRR is the successor to the Committee for State Security of the Union of Soviet Socialist Republics, commonly known as the KGB. It is also commonly referred to as the "SVR."

meeting NICHOLSON received cash payments from the Russians, which he in turned used to pay credit card bills and other expenses. The investigation of NICHOLSON disclosed that one of his methods of communicating with agents of the SVRR was to send postcards using an alias with coded notes regarding upcoming meetings. During his meetings with agents from the SVRR, NICHOLSON provided them with classified national defense information that had been obtained through his employment with the CIA.

12.     Some of the significant classified information that NICHOLSON disclosed included the identity of the new CIA Chief of Station in Moscow and staffing information for this CIA office; the true names and biographic profiles of CIA employees who were at the CIA training facility during NICHOLSON's two-year tenure there; biographic information and assignment listings of CIA case officers; reports concerning CIA human assets and their confidential reporting on foreign intelligence matters; and, human sources of information, whose identities the CIA seeks to protect from disclosure, their code names, positions, and access to particular information. The investigation also showed that NICHOLSON planned on disclosing classified information to Russian intelligence officials concerning the intelligence capabilities and military preparedness of the Russian Federation.

13.     Following his guilty plea, NICHOLSON disclosed that the Russian Federation had paid him approximately $300,000 for his work on their behalf. He told agents that he received $25,000 in Kuala Lumpur in June 1994; $50,000 in New Delhi, India, in December 1994; $50,000 in Jakarta, Indonesia, in May 1995; $125,000 in Zurich, Switzerland, in December 1995; and $50,000 in Singapore in June 1996. On April 22, 1997, NICHOLSON took a polygraph examination pursuant to his plea agreement with the government. NICHOLSON

passed the polygraph as to several questions regarding his contact with the SVRR including

whether he was withholding information regarding additional tasking by the Russian Federation,

and whether he was hiding additional espionage funds. NICHOLSON was found to be deceptive

on the question of whether or not he was deliberately withholding information from the

government that he provided the SVRR. At the time of the polygraph, the FBI agents involved in

the case saw no reason to think NICHOLSON was untruthful despite the deceptive polygraph

result. Following his plea, NICHOLSON told the Presentence Report writer that his criminal

conduct stood in "great contrast" to his prior service. NICHOLSON further stated that "[he]

would greatly appreciate the opportunity to offer some positive example to my children before I

die."

   14. On June 5, 1997, defendant was sentenced in the Eastern District of Virginia by

United States District Judge James C. Cacheris to the custody of the Bureau of Prisons for 283

months to be followed by five years of supervised release. NICHOLSON also forfeited real

property and the proceeds of his espionage activity, including a bank account in Switzerland. At

the time NICHOLSON was sentenced, he was divorced and had sole custody of his three

children, Jeremiah Nicholson, then age 18, Astralena Nicholson, then age 15, and NATHANIEL

Nicholson, then age 12. When NICHOLSON went to federal prison his children moved to

Eugene, Oregon, to be near their mother and live with their grandparents, Marvin C. Nicholson

and Beatrice M. Nicholson. NICHOLSON, an Oregon native, has been serving his 283-month

sentence at FCI Sheridan, Oregon, since August 1997.

   15. As part of NICHOLSON's plea agreement with the government, he acknowledged

that even though he was no longer a CIA employee, he had a continuing duty and obligation as a

former CIA employee not to disclose confidential information and other information acquired as

a part of his performance of his official duties with the CIA in an unauthorized manner.

NICHOLSON also agreed to have no contact with any foreign government or its agents and

agreed not to seek or accept, personally or through another person or entity, any benefit from

such government or its agents.  NICHOLSON agreed to notify the CIA if he or any current or

future member of his family, or some other person or entity acting on his behalf or on behalf of

his family members, received such a benefit.  NICHOLSON also agreed to assign any right to

any future benefits to the United States.

16.     On August 26, 1997, NICHOLSON acknowledged in writing the administrative

procedures put in place by the CIA and the Bureau of Prisons that permit the government to

review and monitor his contact with all outside persons and entities.  All of NICHOLSON's

written correspondence is copied and reviewed by the CIA.  All incoming and outgoing

telephone calls are routed through a CIA approved (703) area code telephone number in Virginia

and are recorded.  Officials at the CIA and/or the Bureau of Prisons approve all persons with

whom NICHOLSON is allowed to have contact in person, over the telephone, or in writing.

## CURRENT INVESTIGATION

17.     In February 2002, the FBI learned that NICHOLSON may have attempted to

communicate with the Russian Federation through other inmates at FCI Sheridan in the summer

of 2000.  On February 11, 2002, a concerned citizen (hereinafter Citizen) contacted the FBI and

provided information she had about NICHOLSON's attempts to pass information to the Russian

Federation.  Citizen told the FBI that on January 26, 1999, she wrote to an inmate (hereinafter

Inmate) at FCI Sheridan after she read Ann Rule's book *The End of the Dream*, which told the

8

story of a series of bank robberies that the inmate committed with Scott Scurlock. Scurlock was famously known as the "Hollywood Bank Robber."

18.    Citizen wrote Inmate and told him that she was fascinated with his story because she had been the victim of a bank robbery when she had worked as a bank teller. In the letter, Citizen also described her work as a paralegal at an international law firm in San Francisco and encouraged Inmate to write her. Inmate responded immediately in a letter dated February 2, 1999. In the letter, Inmate expressed his desire to form a letter-writing relationship with Citizen. At the end of this letter Inmate asked Citizen, "ps: Is it a problem to write you at your work address as legal mail?" Citizen did not think anything of the request to mark the letters as "legal mail" even though her law firm had no legal relationship with Inmate.

19.    Inmate later mailed two envelopes to Citizen at Citizen's home address marking the address label, "Legal Mail," "AAL [Attorney at Law]," and "Attorney at Law." The envelopes contained documents that Citizen was then supposed to send to Inmate's family members. First, Inmate sent Citizen a Louisiana driver's license with Inmate's name and his brother's social security number. Citizen was supposed to send the driver's license on to Inmate's mother. The second item sent to Citizen using the "legal mail" ruse was a movie script that detailed Inmate's exploits as a bank robber. Inmate asked Citizen to forward the movie script to his brother who lived in Italy at the time. Citizen sent the script to Inmate's brother in Italy after receiving it from Inmate. According to officials at FCI Sheridan, that Inmate had no restrictions on his use of the prison mail that would have precluded him from sending the movie script directly to his brother in Italy.

9

20.     By June of 2000, Citizen had become acquainted with Inmate's family, including his mother and brother.  In June of 2000, Inmate's brother traveled to the United States from Italy and went to FCI Sheridan with Citizen to visit Inmate.  The two visited Inmate at FCI Sheridan over the course of several days, beginning on June 6, 2000, and concluding on June10, 2000.  This was the first time that Citizen met Inmate.  During the first or second day of the visit, Inmate sat with his brother and Citizen in the visiting room.  According to Citizen, at one point Inmate leaned forward and pointed in the direction of another prisoner.  Inmate said that he was friends with the prisoner and the prisoner was a Russian spy.  Inmate told Citizen and his brother that the spy had information or documents and "he needed to get them to the Russians."

21.     Inmate asked Citizen and his brother if they would help the spy forward information or documents to the Russians by using the "legal mail" ruse that Inmate had previously used to get the movie script to his brother through Citizen.  Inmate did not, during the June 2000 meeting, identify the prisoner by name.  It was not until February 2, 2002, that Citizen learned that the Russian spy that Inmate was referring to was NICHOLSON.  Citizen learned NICHOLSON's identity from another inmate whom she began talking to and who was NICHOLSON's cellmate in February 2002.  Once Citizen learned NICHOLSON's identity, she contacted the FBI.

22.     On July 29, 2003, Inmate was interviewed by the FBI.  At the time of the interview  Inmate was serving his federal prison sentence at the Federal Correction Institution in Big Spring, Texas.  At the outset of the interview, agents told Inmate that they could not promise him anything in exchange for his statement and that any recommendations they made on his behalf would be wholly dependent upon the nature, quality, and truthfulness of the information

he provided. Inmate is serving a 255-month federal prison sentence that was imposed on

May 14, 1997, after he pleaded guilty in the Western District of Washington to Conspiracy to

Use a Firearm during a Violent Crime, Use of a Firearm During an Assault on a Federal Officer,

Armed Bank Robbery, and Assault on a Federal Officer.

23.    Inmate told the FBI that he met NICHOLSON in 1997 when he was an inmate at

FCI Sheridan. Inmate was also a cellmate of NICHOLSON for about a year prior to Inmate's

transfer to Texas on April 17, 2003. Inmate befriended NICHOLSON and was aware that he

used to work for the CIA and had been convicted of espionage. Inmate understood that the FBI

was interested in the potential that NICHOLSON did not fully debrief with officials from the

United States government upon his entry of his guilty plea and that he had attempted to pass

sensitive information to a foreign government, including the Russian government, even while

NICHOLSON was imprisoned. Inmate told the FBI that NICHOLSON himself was aware of

such concerns and told Inmate that some of the information that he knew would some day

become "stale," or that the information would no longer have value to a foreign government.

Inmate also told the FBI that NICHOLSON told him that he had a kind of retirement "pension"

available to him in Russia and, in spite of NICHOLSON's knowledge that sensitive information

he knew would go "stale," NICHOLSON planned to repatriate to Russia upon his release from

prison.

24.    Inmate told the FBI that about six months prior to becoming NICHOLSON's

cellmate, NICHOLSON approached Inmate and told him he wanted to send a letter to the

Russian Embassy in Rome through Inmate's brother. NICHOLSON was aware that Inmate's

brother lived in Italy and was coming to visit Inmate at FCI Sheridan. NICHOLSON wanted to

provide Inmate with a letter so Inmate could pass it to his brother during the visit. Inmate said

that NICHOLSON told him that he wanted to send the letter to the Russian Embassy in Rome

because the United States had poor coverage of the Russians in Rome and the letter was likely to

go unnoticed by the United States government. Inmate told the FBI that he did in fact ask his

brother for assistance during his brother's visit, but that his brother rejected the idea.

25.     Inmate told the FBI that he was aware that after his brother rejected

NICHOLSON's request to send a letter to the Russians, NICHOLSON asked and received the

assistance of another inmate who, in June 2000, was NICHOLSON'S cellmate (hereinafter

Cellmate). Cellmate showed Inmate the envelope he received from NICHOLSON. Inmate

described the envelope to the FBI as a manila envelope, yellowish-orange in color, and

approximately one to one and one-half inches thick. Inmate did not know the address where the

envelope was to go but concluded it was to go to the Russian Embassy in Rome when Cellmate

told Inmate it was going to the Russians. According to Inmate, NICHOLSON chose to seek

Cellmate's assistance because Cellmate was scheduled to be released from prison in the

immediate future and he could carry items with him out of the prison with little or no scrutiny.

26.     On September 17, 2003, and October 17, 2003, the FBI interviewed Cellmate.

Cellmate told the FBI that about one month before his release in July 2002, NICHOLSON

approached him and asked if he could take a manila envelope with him and mail it for

NICHOLSON. NICHOLSON told Cellmate that the envelope contained his memoirs and that he

wanted Cellmate to send the package to his parents. The envelope was one to one and a half

inches thick. The envelope was unsealed and NICHOLSON told Cellmate not to read the papers

inside the envelope. Cellmate did not recall whether the envelope was already addressed.

12

Cellmate stated that NICHOLSON asked him to take the envelope because if NICHOLSON sent

the envelope himself, the envelope would not be delivered because of the restrictions placed on

his mail.  Cellmate stated that after typing the contents of the package, NICHOLSON disposed of

the typewriter ribbon very carefully.  NICHOLSON ripped or tore up the ribbon into small pieces

and then flushed it down the cell toilet.  Cellmate stated he remembered vividly NICHOLSON's

disposal of the ribbon in the toilet because it caused the toilet to clog and Cellmate was the one

who had to clear the clogs in the toilet.

27.    Cellmate agreed to mail the package to NICHOLSON's parents.  When Cellmate

was released from FCI Sheridan he took NICHOLSON's package with him, and approximately a

month and a half later he mailed the package to NICHOLSON's parents "Nick and Betty

Nicholson" **1699 N. Terry St., SP-161, Eugene, Oregon  97402**.  Cellmate did not look at the

contents of the package.  On October 17, 2003, the FBI conducted a polygraph of Cellmate.  The

examiner asked Cellmate whether NICHOLSON specifically asked him to take classified

information out of the prison and whether NICHOLSON asked Cellmate to mail a package to a

foreign government.  Cellmate answered "no" to both questions.  It was the opinion of the

polygraph examiner that Cellmate was not deceptive when responding to these relevant

questions.  Cellmate has not received, nor was he promised, any benefit from the FBI in

exchange for the information he provided.  Cellmate was convicted in June 1999 in the District

of Nevada of two counts of bank robbery and sentenced to fifty-one (51) months' imprisonment.

In 2004, Cellmate was sentenced to an additional thirty-six (36) months for a violation of the

terms of his supervised release.

28.     Throughout his confinement at FCI Sheridan, NICHOLSON has kept in regular contact with his family members.  NICHOLSON frequently communicates with his parents Marvin and Betty Nicholson and his three children.  Marvin and Betty Nicholson continue to live in Eugene, Oregon at **1699 North Terry Street, Space 161, Eugene, Oregon 97402,** the same location where the package from NICHOLSON was sent in 2002.  His oldest son Jeremiah Nicholson lives in Panama City, Florida, with his new wife Anastassia (Nastia) Alexandrovna Suvbotina.  Nastia is a Russian citizen who moved to the United States and married Jeremiah on or about March 25, 2008.  Jeremiah is on active duty with the United States Air Force and has a security clearance.  NICHOLSON's daughter Astralena (Star) Nicholson is unmarried and lives in Beaverton, Oregon.  She regularly visits her father.

### ACTIVITIES OF NATHANIEL NICHOLSON

29.     NICHOLSON's youngest son NATHANIEL has had the most significant contact with NICHOLSON since he has been at FCI Sheridan.  The investigation has shown that NATHANIEL has been trained and tasked by NICHOLSON to deliver information to agents of the Russian Federation and to collect the "pension" or other money owed to him by the Russian Federation for his previous espionage activities.  NATHANIEL was born July 31, 1984.  After his father went to federal prison he moved to Eugene, Oregon, to live with his grandparents.  He graduated from high school and joined the United States Army in February 2003.  According to military records, NATHANIEL suffered a back injury during airborne training and was medically discharged from the Army in October 2004 and returned to Eugene, Oregon.  He currently resides at **4815 Unthank Avenue, Apartment 388, Eugene, Oregon  97402** and has since July

14

2007. According to United States Department of State database records, on August 23, 2006, NATHANIEL applied for a United States Passport and one was issued in his name.

30.    NATHANIEL has limited financial resources. NATHANIEL was recently employed on a part-time basis at Burton Saw in Eugene, Oregon. This employment was part of an internship program administered through Lane County Community College. He made ten dollars an hour and worked ten to twenty hours a week. As of January 2008, banking records for NATHANIEL reveal that he receives a disability benefit from the Veteran's Administration of approximately $512 a month. He currently receives approximately $541 per month under the Veteran Administration's Vocational Rehabilitation and Employment (VR&E) program. I have learned through court authorized surveillance that NATHANIEL's last day at Burton Saw was December 6, 2008. NATHANIEL has told his advisor/instructor that he intends to pursue a degree in mechanical engineering at Oregon State University in the Spring term.

31.    NATHANIEL has worked at various jobs since his discharge from the Army and has intermittently been enrolled as a student at Lane Community College since early 2005. He does not appear to have accumulated any savings. The investigation disclosed that NATHANIEL has maintained personal bank accounts at Washington Mutual. A review of these accounts indicate that from January 2005 to November 2006 there were bi-monthly deposits that ranged from $127.26 to $399.79 from NATHANIEL's employment at Pizza Hut. According to bank records, NATHANIEL's final check from Pizza Hut in August 2006 was for $42.08. There were also small cash deposits during this time that I believe were from tips NATHANIEL received during his employment at Pizza Hut. From August to October 2006, NATHANIEL was

15

employed by the Bankers Life and Casualty Insurance Company. Bank records for NATHANIEL do not reveal that he received any significant income from this employer.

32.    An analysis of written correspondence between NICHOLSON and NATHANIEL indicates a concerted effort by NICHOLSON to use NATHANIEL as his conduit for contact with representatives of the Russian Federation beginning in the fall of 2006. From October of 2005 until September of 2006 NICHOLSON wrote NATHANIEL seven times. In the period beginning in October 2006 and ending in September 2007, NICHOLSON wrote to NATHANIEL seventeen times. NICHOLSON did not contact other family members or friends with the same increased frequency.

33.    The letters sent by NICHOLSON during this time period also underscore his continued efforts to condition NATHANIEL to work on his behalf. In a letter dated January 29, 2007, that NICHOLSON sent NATHANIEL, he quotes Jeremiah 1:4-8, and tells NATHANIEL that "[b]efore you were born I set you apart and anointed you as my spokesman to the world." In another letter that NICHOLSON sent to Kanokwan Lehliem (his girlfriend in Thailand) on January 1, 2007, he refers to NATHANIEL as "my right-hand man" and goes on to explain that "[d]ad says Nathan is exactly like I am - enjoys the same things, enjoys adventure with a little danger like me (maybe too much danger sometimes) loves travel, is disciplined, neat and full of life." In a letter to NATHANIEL dated April 20, 2008, NICHOLSON quotes Micah 7:8-9: "[D]o not gloat over me my enemies! For though I fall, I will rise again." [emphasis in original].

34.    Beginning in December of 2006, NATHANIEL took several steps to assist his father in communicating with Russian intelligence officials. Based upon a review of records, evidence, and travel information described below, I believe that NATHANIEL met with Russian

16

intelligence officials in Mexico City, Mexico, in December 2006 and in July 2007. A review of the Treasury Enforcement and Customs System (TECS) revealed that on December 12, 2006, NATHANIEL traveled from Portland, Oregon, to Mexico City, Mexico, and that he returned on December 17, 2006. According to the Airline Reporting Company (ARC), an unidentified individual paid $803.84 in cash for the ticket NATHANIEL used at CWT-Premier Travel and Cruise in Springfield, Oregon, on December 11, 2007. ARC records also show that this ticket was issued in NATHANIEL's name. Customs declaration forms were unable to be located to determine if NATHANIEL reported any currency upon entering the United States on his return. However, Washington Mutual records indicate that on October 30, 2006, someone started making cash deposits into NATHANIEL's account in one hundred dollar increments. These deposits continued until January 22, 2007, for a total amount of $2,900. These deposits were inconsistent with previous payroll deposits into NATHANIEL's account.

35.    A review of NICHOLSON's communication with his family members during this period also shows that NICHOLSON anticipated that NATHANIEL would be receiving payments from Russian intelligence officials. In a Christmas card dated December 13, 2006, NICHOLSON tells NATHANIEL to "[e]njoy the blessings that are coming in." And in a letter to Kanokwan on December 27, 2006, NICHOLSON tells her that "I just know this is going to be a great year for us - not only for what I expect them [Congress] to do, but for other reasons dealing with our future also." In telephone conversation recorded on December 13, 2006, between NICHOLSON and Star Nicholson, Star tells NICHOLSON that her car won't run and that she is worried about paying her mother back for the cost of repairs. NICHOLSON tells Star that he's been "working on some things" and that within a week he will be able to pay her mother

17

back. NICHOLSON tells Star that she may need to give him until Sunday to help her. Sunday, December 17, 2006, was the day NATHANIEL returned from Mexico.

36.    TECS records reveal a second trip by NATHANIEL from Portland, Oregon, to Mexico City, Mexico, on July 9, 2007. NATHANIEL returned from that trip on July 12, 2007. ARC records also show that an unidentified individual paid $502.69 in cash for this ticket at CWT-Premier Travel and Cruise in Springfield, Oregon, on February 7, 2007. ARC records also show that this ticket was issued in NATHANIEL's name. Upon his return to the United States on July 12, NATHANIEL declared $9,080 in U.S. currency and a $100 pearl necklace. Washington Mutual bank records show multiple cash deposits ranging from $500 on July 13, 2007, up to $1,200 on July 30, 2007, for cash deposits into NATHANIEL's bank account totaling $2,300 during that time.

37.    On June 23, 2007, NATHANIEL told NICHOLSON during a recorded telephone conversation that he was short on money and might not be able to purchase snacks for him during the next visit to Sheridan. NICHOLSON suggested that NATHANIEL should stop by his grandparents home because "they have a little bit of money in that thing there and pick up a hundred bucks for yourself." NATHANIEL told NICHOLSON he thought he was fine right now and he was reluctant to ask his grandparents for money. After further discussion about NATHANIEL's veteran's benefits, the subject changed to NATHANIEL's next visit to see his father in person at Sheridan. The June 23, 2007, conversation continued:

NATHANIEL: "Hey Pa, how many more times am I gonna be able to uh, uh . . . visit before that thing?"

NICHOLSON: "Uh, well, I think, uh, just this time . . . this is the next . . . this is the only time I think."

NATHANIEL: "Okay, I was thinking of maybe making like a Friday trip up there."

NICHOLSON: "Yeah, maybe like, um, the week after this coming week or so."

NICHOLSON: "Okay, yeah anytime you come up is fine.  You know that."

NATHANIEL: "Okay."

The conversation continued:

NICHOLSON: "Well, you know things are just on the verge of picking up really good for us.  You know, things are . . ."

NATHANIEL: "Oh, yeah."

NICHOLSON: ". . .things are really gonna, gonna break loose here, so it's gonna be great."

NATHANIEL: "Oh yeah, I'm really excited for it."

NICHOLSON: "Me too, me too.  Yeah, wow, okay."

38.    Based on what I have learned during this investigation, I believe that NATHANIEL is referring to his planned trip to Mexico City between July 9 and July 12, 2007, when he was asking how many more visits before "that thing."  Visitation records for FCI Sheridan confirm NATHANIEL visited his father on Friday, July 6, 2007.

39.    In December, 2007, I believe NATHANIEL traveled to Lima, Peru, to meet with Russian intelligence officials.  Court authorized electronic surveillance of NATHANIEL's cellular telephone number 503-569-9345 revealed that on December 7, 2007, NATHANIEL had a telephone conversation with his sister Star Nicholson.  During the call, NATHANIEL told his

sister that he was going to the Oregon coast with his girlfriend on December 10, 2007, and that

he would return on December 13, 2007.  On December 10, 2007, at approximately 8:30 am, a

court authorized tracker attached to NATHANIEL's **2005 Chevrolet Cavalier, Oregon license**

**plate D/2 0156** showed that his car was parked at the Portland International Airport in Portland,

Oregon.  A review of airline records showed that NATHANIEL left Portland at 6:00 am en route

to Lima, Peru, via George Bush International Airport in Houston, Texas.  Travel records showed

that NATHANIEL was scheduled to return to Portland through Houston on December 13, 2007.

ARC records show that an unidentified individual paid $1,160.70 in cash for this ticket at CWT-

Premier Travel and Cruise in Springfield, Oregon on October 11, 2007.

40.     While NATHANIEL was in Lima, Peru, from December 10, 2007, to

December 13, 2007, law enforcement conducted surveillance of his residence at Heron Meadows

Apartments, **4815 Unthank Avenue, Apartment 388, Eugene, Oregon 97402**.  Although

NATHANIEL told his sister he was at the beach with his girlfriend, agents watching the

apartment never saw NATHANIEL's girlfriend leave the apartment during the time period

NATHANIEL was out of the country.  In a ruse to confirm she was still in the apartment, an

undercover agent knocked on the door and NATHANIEL's girlfriend answered.

41.     On December 13, 2007, NATHANIEL arrived at the Airport in Houston, Texas,

from Lima, Peru.  When he arrived, he was directed by Department of Homeland Security

Customs and Border Protection (CBP) Inspectors to submit to a secondary search and

questioning.  FBI Special Agent John M. Cooney and I observed from a distance the search and

questioning of NATHANIEL.  According to CBP inspectors, during questioning, NATHANIEL

gave CBP inspectors a customs declaration Form 6059B which was signed and dated

20

December 13, 2007. NATHANIEL initially claimed that he was bringing $6,000 in U.S. currency into the United States from Peru. When he was asked why he was bringing so much cash back into the United States, NATHANIEL said that his credit cards were "maxed out" and that he had left the U.S. with $6,500 in cash. NATHANIEL told CPB officials that he had saved his Veterans benefits checks since May, and cashed them before his departure. An analysis of NATHANIEL's bank records show that he receives his Veterans benefit checks (both VA disability and VR&E payments) by direct deposit, not by check.

42.    CPB officers then searched NATHANIEL's backpack and personal effects. NATHANIEL had $7,013 in U.S. currency. This sum was in $100 dollar bills, one ten dollar bill and three one dollar bills. Of the $7,013, $4,000 was located in the inside cover of a Play Station video game case. NATHANIEL then told the inspectors that he did not recall exactly how much cash he had brought into the United States from Peru, but that he had left the United States with $9,000.

43.    NATHANIEL also had a small 80 page "Composition" notebook, various business cards, identification cards and credit and debit cards. The contents of the notebook and the business cards were photocopied at the airport without NATHANIEL's knowledge. Among the items discovered during that search was one of NATHANIEL's business cards from Bankers Life and Casualty Company in Eugene with the following hand written notes on the back: "Jose Vasconcelos 204, Colonia Hipdromo Condesa, Delegacion Cauhtmoc, 06140, Mexico, D.F." A check of public records revealed this is the address of the Russian Embassy in Mexico City, Mexico.

/////

21

44.    NATHANIEL had a another business cards with the following hand written notes on the back: "July 10th-12th, 10am-1pm, Let know letters were received, His version -of the reasons which lead [sic] for the suspecician [sic], the investigation." The date "10th" is circled on the card. I believe these notes refer to NATHANIEL's July 10, 2007, trip to Mexico City, Mexico, to meet with Russian intelligence officials and inquiries made by the Russian Federation regarding NICHOLSON's arrest. I also believe that the comment "[l]et know letters were received" may be a reference to the package that NICHOLSON asked Cellmate to send to Betty and Marvin Nicholson at their address **1699 N. Terry Sp. #161 Eugene, OR 97402,** upon the Cellmate's release from FCI Sheridan in 2002.

45.    The notebook contained handwritten notes confirming  NATHANIEL's contact and communication with Russian intelligence officials while in Lima, Peru as well as detailed plans for NATHANIEL's next meeting with the Russian intelligence officials in Cyprus on December 10, 2008. Several pages of the notebook were blank. Many of the entries are coded or cryptic and I have indicated below what I believe the meaning of the notation is based upon the investigation. The below detailed entries are relevant to this investigation and are in the order they were observed in the notebook.

First relevant page:

Marvin and Betty Nicholson (Grandparents)
**1699 N. Terry Sp. #161**
**Eugene, OR 97402** (541) 461-2670

Harold J. Nicholson (Dad)
F.C.I. #49535-083
P.O. Box 5000
Sheridan, OR 97378

Kanokwan Lehliem
214 M00.1, Banmaisaithong
Aranyaprathet, Sakaew 27120
Thailand

Next relevant page:

Star Nicholson (Sister)
2345 NW Schmidt Wy
#101          = $50,000
Beaverton, OR 97006

Jeremi Nicholson (Brother)
1813 Riversedge Rd
#303          = $25,000
Springlake, NC 29390   (503) 569-9204

Anastassia Alexandrovna Suvbotina
21-48 Kadykov St (Brother's girlfriend)
Cheboksary, Russia 428037

Chrisandra Rachel Horton (My girlfriend)
4455 Cascade Dr
Eugene, OR 97402 (541)285-85502

Next relevant page:

$8,500 car
$2,100 WAMU
2,000 Citi
<u>8,000 Loans</u>
$20,600

Based on the investigation, I believe this is a list of NATHANIEL's outstanding debts.  On two

pages of the notebook after the pages referenced above, there is a calendar of July through

December 2007.  Below the calendar in the notebook is the following notation:

Dec. 11-13
10am by local time to 1pm by self
Peru (Lima) Consular Section
Avenida Salaverry 3424

23

A check of public records confirm that the address of Avenida Salaverry 3424 is the address of the Russian Embassy and Consulate in Lima, Peru.  Below the address to the Russian Embassy is the following:

> Jopemurr2@yahoo.com.mx
> pass. Florida12
>         Carl (unreadable)
> Friends – Nancy
> My name – Dick


Next relevant page:

> Only if problem
> My brother Eugene . . .
>         Ill had to cancel
>         Meet at . . .
> Ex.) if meet at day <u>16,</u> +2 . . . put <u>18</u>


Next relevant page:

> <u>Case [sic] & Effect</u>
>         To arrest
> Analysis of beginning of relations starting w/Malaysia
> <u>Own</u> desire to go to Farm, OR forced by higher ups to do so.
> <u>When, Months</u> he was suggested to go to Ethiopia
> Date of Cancellation, <u>who</u> decided <u>not to go to Ethiopia and why</u>.
> <u>Why</u> (beliefs) it was cancelled?


Next relevant page:

> Was there anything suspicious during the time of suggestion to go
> to Ethiopia, to the time of cancellation of Ethiopia?
> Was he under investigation already in this period of time?
> <u>How</u> (suggestions) would they know about relation (w/friends)
> during this period of time?
> <u>Who</u> (names interrogated? (From CIA and FBI)
> <u>What</u> questions were asked concerning relationships w/friends?


Next relevant page:

> What <u>hints</u> were given showing that the <u>interrogators-knew</u> about
> the relations <u>before</u> the interrogations?


Next relevant page:

Dad is well-Christian
- possibility of freedom in Sept.
Idea for RV's. A means to explain the income- a means to Explain
traveling- would be used to transport agents to and from- could be
good business before/during/after Olympics.
We are grateful for help and very thankful.  Money is not wasted
and still needed.

At the bottom of the above page there is a horizontal arrow pointing to the right, indicating that

text is continued on the next page.

Next relevant page:

Grandparents know the situation.  They are trustworthy, and will
help-w/cover up.
Jeremi and Star are also trustworthy, but do not need to know at
current moment.
Dad decided this.
Possibility bring girlfriend to help transport.

Next relevant page:

Asked: Password
Dec. 10, 2008 11, 12 - Alternate
(Wednesday)

Nicosiya [sic] in Cypros [sic]
7pm local 1900
Alternate @ 2000

Meet in City.
Entrance to restaurant "TGI Friday"
    12 Diagorou Avenue

Confirm meeting
Not later than 10 October from Internet Café "it is great to recieved
[sic] your message. I love you too. Hope to see you soon. The best
regards from my brother Eugene."  -Love Dick

If not able/delayed -
"Hope to see you (month supposed to) (Day +2) [i.e. Dec. 28
would be Dec. 30] best regards, from my brother Eugene.

After 10th of October, check often. . .

If something happens (unpredictable . . . i.e. can't get internet, etc)
then meet anytime working days in Mexico.  Standard procedure.
Give 3 days of time.
Ask: can you show me the way to the general post office?
Answer: It should be somewhere here. Let me show it for you.

There is a note in the right margin of the page "take backpack (black and gray) in right hand."

Next relevant page:

If Dad gets out, get passport ASAP. Travel to country nearby
Russia.  Up to him (Dad) (i.e. Finland)
2 months before his (Dad) travels.
Same procedure on e-mail.
"My brother Eugene, planning to go to (whatever country) on
(Month +2 days)"
Have him go to Visa section of Embassy (Friends)
Same procedure-ask for Chief of Security

Next relevant page:

Discussed procedure
Confirm obligations to help with assistance
No more messages until we see each other personally

46.     I believe NATHANIEL's notebook sets forth the detailed plan and procedure for

him to travel to Cyprus to meet with his Russian handlers on December 10, 2008, at 7:00 pm at

the TGI Fridays.  Agents have confirmed the TGI Fridays is located at 12 Diagorou Avenue, the

address listed in the notebook.  The notebook appears to set forth questions Russian intelligence

officials had regarding the arrest and interrogation by the CIA and FBI of NICHOLSON in 1996.

I believe NATHANIEL has been tasked by Russian intelligence officials to provide the answers

to these questions to them at their December 2007 meeting in Lima, Peru, or the planned

December 2008 meeting in Cyprus.

47.     The notebook also contained detailed instructions describing how NATHANIEL

is to communicate with his Russian handler leading up to the December 10, 2008, meeting in

Cyprus.  Specifically, NATHANIEL was to use the Jopemurr2@yahoo.com.mx email account

and use the code names Dick, Eugene and Nancy.  NATHANIEL was to confirm the meeting no

later than October 10, 2008, by sending a message from an internet café.  He was directed to send

a specific message: "It is great to receive your message.  I love you too.  Hope to see you soon.

The best regards from my brother Eugene.  Love Dick."  After October 10, 2008, NATHANIEL

is to check the email often.  He was also given a message to use if he is delayed or not able to

make the meeting.

      48.    In April 2008 I reviewed a letter sent from NICHOLSON to NATHANIEL on

March 28, 2008.  The letter included an article from a travel magazine about architecture of

various museums.  The article referred to a design plan for a museum in Beirut that

NICHOLSON described as "audaciously risky . . . but if that city could ever be peaceful, it would

be a good place.  The weather there (Mediterranean) is very pleasant.  Cyprus would perhaps be a

safer place to build such."  This is consistent with NICHOLSON's contact with NATHANIEL

prior to NATHANIEL's trip to meet with the Russian intelligence officials in Lima, Peru, in

December 2007.  On August 2, 2007, NICHOLSON wrote the following in a letter to

NATHANIEL:

> "Anyway, if you get the chance I'd recommend hopping down to S. America to
> check it out.  Brazil, Argentina, Chile or Peru could be great places to visit.  Peru
> would be the cheapest although Brazil might not be too bad either.  I'd steer clear
> of Colombia and those countries along the top."

I believe the reference to Peru was a reference to NATHANIEL's meeting with the Russian

intelligence officials in Lima, Peru, in December 2007, and the reference to Cyprus is referring to

NATHANIEL's planned December 2008 trip to Cyprus.

49.    Court authorized electronic surveillance of the email account listed in

NATHANIEL's notebook - Jopemurr2@yahoo.com.mx - revealed that on May 21, 2008, the

following email message was sent from email account Jopemurr2@yahoo.com.mx to email

account Jopemurr2@yahoo.com.mx:

> SUBJECT LINE: Hola Nancy!
> "Hello Sweety! How are you? I'm good. Sorry for taking so long to write to you...
> you know how work is and all. Anyways, things are good. It looks like I will still
> be able to go on that vacation! I will keep you updated on that though. I am very
> much looking forward to it, and to seeing you again! Well hon, I just thought I'd
> say "hi" since I had the time!"

Records from Qwest Communications Corporation confirm that the IP address that was used to

log in to email account Jopemurr2@yahoo.com.mx is subscribed to the Heron Meadows,

Building Clubhouse, 721 Throne Drive, Eugene, Oregon 97402. This is the clubhouse building

of the apartment complex where NATHANIEL lives. This building houses the gym and internet

access terminals for tenant use.

50.    During this time, I believe NICHOLSON has continued to counsel NATHANIEL

regarding his contacts with Russian intelligence officials. In a birthday card he sent to

NATHANIEL dated July 11, 2008, he makes clear his intentions: "You have been brave enough

to step into this new unseen world that is sometimes dangerous but always fascinating. God

leads us on our greatest adventures. Keep looking through your new eyes. I understand you -

and me"

51.    Court authorized electronic surveillance of NATHANIEL's internet access

through his Comcast internet account subscribed to his residence located at **4815 Unthank**

**Avenue, Apartment 388, Eugene, Oregon, 97402** revealed that on July 28, 2008,

28

NATHANIEL searched the travel site Orbitz for flight information for travel from both Eugene,

Oregon, and Portland, Oregon, on November 30, 2008, for travel to Ercan Airport, Cyprus on

December 5, 2008.

52.     In September 2008, FCI Sheridan provided the FBI with a six page letter dated

August 31, 2008, from NICHOLSON to NATHANIEL. The letter  provided detailed

information about NICHOLSON's physical health.  It also contained personal information about

his family members.  This letter is qualitatively different from the other correspondence sent by

NICHOLSON that I have reviewed.  NATHANIEL has kept in almost constant contact with

NICHOLSON since his arrival at FCI Sheridan.  There appears to be no reason to put this kind of

detailed information, much of which is presumably already known to NATHANIEL, in a letter

for him.  As a result, I believe this information is intended for NATHANIEL to provide to the

Russian Federation when he meets with Russian intelligence officials in Cyprus in December

2008.  HAROLD NICHOLSON's letter begins by describing his own physical health as follows:

"Next I want to tell you how my physical exam went this month.  In general I am

in excellent physical condition.  Here is some statistics:


Height: 6 feet 0 inches          DOB 17 November 1950
Weight: 194 pounds
Eyes: Blue (corrected to 20/20)
Blood Pressure: 127/67 (20 Aug 20008)
P.S.A.: 1.3 (normal range is 0-3.6)
My blood work came back looking good - no diseases, good
cholesterol level (7 Aug 2008)
My EKG exam also looked good (20 Aug 2008)


I am not taking any medications and have a regular exercise regimen.  I do take
one aspirin every day.  I have no allergies."

29

53.     I believe that NICHOLSON intended for this information to reach

NATHANIEL's Russian contacts so they could prepare a visa upon his release from prison.  I

believe the information may have also been intended  to assure the Russians that NICHOLSON

is in good health.

NICHOLSON went on to write:

"I want to update you on the status of my release.  A few months ago, Bush signed
into law a bill called the Second Chance Act.  It began as an act that would have
resulted in my immediate release, however, the final version did not provide for
any significant changes.  Still, there is no need for concern, the federal prison
situation is broken and something must be done soon.  In a few weeks, two new
bills will be submitted for vote in Congress.  Both of these are possible to be
passed, but either could get me out of prison now or within a short time."

I believe NICHOLSON is referring to the Second Chance Act signed by the President April 8,

2008, which changed the eligibility requirements for the home detention program for elderly

inmates.  NICHOLSON also appears to be referring to two other bills in Congress that he thinks

will effect his federal prison sentence.  One of these bills is H.R. 7089, a bill to restore good time

allowances.

NICHOLSON goes on in the letter to NATHANIEL to describe details about his other

son Jeremi:

"As you know, Jeremi and his new wife Nastia are doing ok Panama City, Florida.
He works at Tyndall Air Force base and travels to/from Eglin AFB once a week.
It was on the sprawling Elgin base that the jungle part of U.S. Army Ranger
school is conducted.  I spent a few weeks in that hell hole myself in 1972 while
earning my Ranger tab.  I'm sure the Air Force part of the base is much nicer.
He's a S/SGT and still would like to be an officer - which he would have been if
they hadn't sat on his security clearance for so long, no doubt because of me.  He
has a B.S. in computer science and works in electronic warfare . . . and [he] has
promised Nastia to send her home once per year."

30

I believe this letter is written for someone other than NATHANIEL. I believe that NICHOLSON is attempting to communicate information to the Russian Federation through NATHANIEL that Jeremi may hold some future value based on his security clearance and access to Air Force bases.

54.    NICHOLSON goes on in the letter to discuss his girlfriend of many years who lives in Thailand. He states: "Kanokwan is also a trooper. She told me that after my arrest there was no one else she wanted and said she planned to wait for me as long as it took." NICHOLSON then wrote: "Mom and Dad visit still every other week and have been a true blessing to us. I couldn't have better parents. Grandma is now 95, would visit if she could and uncle Harold, now 92, visited just last month. With family like this, how could I complain."

55.    In the letter NICHOLSON also mentions an individual named Marco Meroni and his wife Margrit Meroni. NICHOLSON met Meroni while in custody in the Eastern District of Virginia in 1996 while Meroni was in federal custody on money laundering charges. Meroni was deported from the United States to Switzerland in October, 1997. NICHOLSON has corresponded regularly with Meroni throughout his incarceration. NICHOLSON's letter to NATHANIEL continues:

> "I'd also like to visit my old friends, Marco and Margrit Meroni in Switzerland if I have the chance one day. They and their family are good friends and it would be great to see them. I want you with me through the adventures of the future. You like what I like and live like I live[.]"

NICHOLSON concludes the August 31, 2008, letter to NATHANIEL with the following:

> "Although it might be a while before we get rolling, when the time comes where we can save significant amounts, it would be wise to put at least half in Euros. The U.S. $ is precarious. So, just in case you win the lottery as you hope, you can use this tip."

56.     Although the investigation has shown that NATHANIEL has on occasion played
the lottery, I believe that NICHOLSON may be using the term "lottery" as a proxy for funds paid
by the Russian government.  I also believe that NICHOLSON is intimating that he and
NATHANIEL might expect future payments from the Russian Federation and that
NATHANIEL should suggest that such funds be paid in Euros and deposited into a foreign bank
account.  At the bottom of the final page of the letter were two Post-It notes that contained lists
of reading materials for NATHANIEL to obtain on NICHOLSON's behalf.  I believe that
NICHOLSON may have used the Post-It notes so that NATHANIEL could remove them from
the letter prior to providing it to his Russian contacts.

57.     Finally, in the August 31, 2008, letter NICHOLSON enclosed an article cut out
from a unknown magazine on skyscrapers around the globe.  The article included drawings of
fourteen buildings lined up from left to right.  The first depicted is the Petronas Twin Towers in
Kuala Lumpur, Malaysia, of 1998.  Over this drawing, NICHOLSON wrote the following note:
"Nathan, check out these towers, remember the Petronas Towers were being built when we were
in K.L.?  Look at what's coming up!"  One of the fourteen buildings depicted is the "Russia
Tower" planned for Moscow in 2012.  It is unclear what NICHOLSON may mean here.  The
reference to the future could be as simple as suggesting that some day NICHOLSON may reside
in Russia.

58.     On September 7, 2008, court authorized surveillance of NATHANIEL's telephone
number 503-569-9345, revealed a conversation between NATHANIEL and his sister Star.  Star
asked NATHANIEL whether he will continue with school and pursue a degree in architecture.
NATHANIEL responded: "I'm just sort of like waiting for more excitement to happen, waiting

for more big changes in our lives." Star told NATHANIEL she did not like big changes.

NATHANIEL replied he does not like the "bad stuff." He likes it if it's good stuff, "like winning

the lottery or something."

59.    Court authorized electronic surveillance of email account

Jopemurr2@yahoo.com.mx revealed that on October 10, 2008, at approximately 9:58 a.m.

someone logged into the email account, Jopemurr2@yahoo.com.mx, from an IP address assigned

to Lane Community College and wrote the following message:

> Hola Nancy! It is great to receive your message! I love you too. I hope to see you
> soon! The best regards from my brother Eugene!
> -Love
> Dick

The email message was left in the "draft" folder of the Jopemurr2@yahoo.com.mx email

account. By placing the message in the "draft" folder of the email account it can be viewed by

the person it was intended for without being sent through the internet service providers where it

could potentially be intercepted by law enforcement. NATHANIEL followed the instructions of

his Russian handlers that he had written in his notebook that I viewed when he arrived from

Lima, Peru, on December 13, 2007, after his meeting with the Russian Federation:

> "Confirm meeting
> Not later than 10 October from Internet Café "it is great to receive your message. I love
> you too. Hope to see you soon. The best regards from my brother Eugene." -Love Dick"

60.    Court authorized electronic surveillance of the email account listed in

NATHANIEL's notebook - Jopemurr2@yahoo.com.mx - revealed that NATHANIEL logged in

to the Jopemurr2@yahoo.com.mx email account in Eugene, Oregon, on the following eight

occasions in addition to October 10, 2008: October 15, 2008, October 17, 2008, October 23,

2008, October 29, 2008, November 3, 2008, November 7, 2008, November 14, 2008, at

approximately 9:50 a.m., and November 20, 2008.  At the time of the log in on November 14,

2008, surveillance agents observed NATHANIEL at the Lane Community College library where

the computer access terminals are available for use.  Based the forgoing information, I believe

that NATHANIEL is following the directive in the notebook to "check often after October 10."

61.     On November 17, 2008, at approximately 11:19 a.m., surveillance agents

observed NATHANIEL drive to Bonaventure Travel Agency in Eugene, Oregon.  NATHANIEL

entered the travel agency and was there for approximately one hour.  He was observed leaving

the travel agency with papers in his hand.  ARC records show that on November 17, 2008, an

individual paid $1,584.41 in cash at Bonaventure Travel Agency in Eugene, Oregon, for an

airline ticket leaving Portland, Oregon, on December 8, 2008, traveling through John F. Kennedy

Airport in New York, through Istanbul, Turkey, arriving in Ercan Airport, Lefkosa, Cyprus, on

December 9, 2008.  The return flight of the itinerary purchased departs Ercan, Airport, Lefkosa,

Cyprus, on December 14, 2008, through Istanbul, Turkey, and JFK Airport in New York and

arrives in Portland, Oregon, on December 14, 2008, at approximately 11:30 pm.  The flight

arrival information was confirmed via public records checks of the flights revealed by the ARC

records.  ARC records also show that this ticket was issued in NATHANIEL's name.

62.     On November 25, 2008, court authorized surveillance of NATHANIEL's

telephone number 503-569-9345, revealed an incoming call from Bonaventure Travel Agency.

The person advised NATHANIEL that his flight on December 9, 2008, from Istanbul, Turkey, to

Ercan Airport in Lefkosa, Cyprus, has been cancelled and he was rebooked on a later flight the

following morning. The person told NATHANIEL the later flight would depart Istanbul, Turkey,

to Ercan Airport at 6:40 a.m. and would arrive Ercan Airport at 8:15 a.m. December 10, 2008.

## BETTY AND MARVIN NICHOLSON

63.     Betty and Marvin Nicholson are NICHOLSON'S parents. As noted above, they

have been in regular contact with NICHOLSON since his incarceration at FCI Sheridan began in

1997. According to visitation records, they visit NICHOLSON on the average of twice a month.

They also speak and write to him regularly. They live at **1699 North Terry Street, Space 161,**

**Eugene, Oregon 97402,** and they have owned that property since 1993. I believe there is

probable cause to that Marvin and Betty Nicholson are involved in maintaining and storing the

currency and proceeds that NICHOLSON and NATHANIEL are receiving from the Russian

Federation.

64.     As previously outlined in this affidavit, in July 2000, the person identified as

Cellmate mailed a package apparently intended for the Russian Federation to NICHOLSON's

parents at **1699 North Terry Street, Space 161, Eugene, Oregon 97402.** In December 2007,

when NATHANIEL returned from what I believe was a meeting Russian intelligence officials in

Lima, Peru, the notebook he was carrying contained the notation that his grandparents know the

situation and that they are "trustworthy and will help w/cover-up." I believe that NATHANIEL

is storing United States currency obtained from his meetings with Russian intelligence officials at

Betty and Marvin Nicholson's residence and that this money is being stored there with the

knowledge of Betty and Marvin Nicholson. I have reviewed Betty and Marvin Nicholson's

financial records for the years 2003 through 2007. These records do not show any abnormal

activity nor do they show any significant activity involving cash, particularly during 2006 and 2007.

65.     The phone conversations described below between NICHOLSON and his family members show that Marvin and Betty Nicholson have a financial relationship with NICHOLSON that involves them storing money controlled by NICHOLSON and accessed by NATHANIEL.

66.     On December 14, 2006, in a recorded telephone conversation Star told NICHOLSON that the total to fix her car would be approximately $570 including towing. NICHOLSON insisted on paying for the repairs and said that he needed to talk to grandpa about it Saturday because grandpa was holding the money.

67.     On December 16, 2006, in a recorded telephone conversation Star told NICHOLSON that her mother was stressed about money.  NICHOLSON told her he talked to grandma and grandpa and that he will tell her about that when he sees her on Saturday. NICHOLSON told Star they have been putting something aside for them.

68.     On December 17, 2006, in a recorded telephone conversation Jeremiah told NICHOLSON that he sent $500 to his mother for Star's car.  NICHOLSON told Jeremiah he did not need to do that.  NICHOLSON said that he was working with grandma and grandpa to work something out.

69.     On July 15, 2008, NATHANIEL and NICHOLSON were recorded during a telephone conversation talking about getting birthday presents for Betty Nicholson and another family member.

NICHOLSON: "Is it getting close enough for us to start thinking about getting a little something for grandma and Uncle Rob for their Birthdays?"

36

NATHANIEL: "Yeah, yeah. Probably, probably."

NICHOLSON: "I was thinking maybe I would have you pick up a little money from grandpa toward that end."

The conversation continues:

NICHOLSON: "I was thinking I'd like for you to also pick up about a hundred to give Star...I think if you just got 200 from him that would probably work. Okay? Bring up one to Star and then hang on to one for yourself.

70.    On July 15, 2008, in a recorded telephone conversation NICHOLSON told Star: "I am going to have Nathan pick up a little money from grandpa, about one hundred dollars. And I'm going to have him bring it when you guys come for a visit on Saturday and give it to you."

71.    On July 17, 2008, NICHOLSON and Marvin Nicholson were recorded during a telephone call making arrangements for NATHANIEL to pick up money from Marvin Nicholson. NICHOLSON told his father, "Hey dad, listen, I'm sending Nathan by tomorrow. Would you give him 200 out of my account?" Marvin responded by saying, "Sure."

72.    On July 18, 2008, in a recorded telephone call NATHANIEL told NICHOLSON "I swung by grandma and grandpa's just a little bit ago." NICHOLSON replies, "Oh good, so you got the cash, huh?" NATHANIEL responded, "Yep, sure did."

73.    On October 4, 2008, in a recorded telephone conversation NICHOLSON told his father that NATHANIEL was going to come by Marvin Nicholson's home and pick up some money for birthday presents for Star and Tammie. NICHOLSON stated: "Two should be enough for that."

74.    I have reviewed Bureau of Prisons' records that show financial transactions that NICHOLSON has made while at FCI Sheridan. NICHOLSON has an inmate financial account through the Bureau of Prisons that permits him to save, send and receive money to and from individuals outside of FCI Sheridan. I have reviewed the relevant records from 2004 to 2006. In 2004, NICHOLSON sent Marvin Nicholson a total of approximately $855. In 2005, he sent him a total of approximately $400. In 2006, he sent him a total of approximately $300. In 2007 and 2008 NICHOLSON did not send Marvin Nicholson any money. According to these records, NICHOLSON did not send any money to Betty Nicholson during this period. Additionally, from January 2007 to May 2008, Marvin Nicholson placed a total of $1,300 into NICHOLSON's account through a series of transactions. On July 16, 2007, NATHANIEL placed $300 into this account.

75.    Based on the conversations described above, I believe that NATHANIEL and NICHOLSON are talking about United States currency being held on their behalf at Marvin and Betty Nicholson's residence. I also believe this cash is in the form of $100 bills based on the references to round numbers and NICHOLSON's later use of the word "two" while he is referring to two-hundred dollars. This is consistent with the one hundred dollar bill denomination that NATHANIEL had in his possession when he returned from Lima, Peru. I believe it is NICHOLSON's cash and that NATHANIEL has access to the money with NICHOLSON's permission. Some of this money may represent the pension NATHANIEL has been collecting on NICHOLSON's behalf for his past espionage activities.

/////

## LOCATIONS/VEHICLE TO BE SEARCHED

**4815 Unthank Avenue, Apartment 388, Eugene, Oregon  97402.**

76.    On December 10, 2008, a utility information check disclosed that NATHANIEL

NICHOLSON, date of birth July 31, 1984, is the customer at **4815 Unthank Avenue,**

**Apartment 388, Eugene, Oregon.**  Continuous physical and real time video surveillance of this

location has confirmed as recently as December 7, 2008, that NATHANIEL resides at this

apartment.  He enters and leaves the apartment consistent with the times of his work and school

schedules.

77.    The FBI has previously conducted limited court authorized physical searches of

NATHANIEL's residence, located at **4815 Unthank Avenue, Apartment 388, Eugene, Oregon**

**97402** on October 13, 2007, December 15, 2007, and December 6, 2008.  During the October 13,

2007, court authorized search, the FBI produced an image of hard drives of computer hardware

located in NATHANIEL's apartment.  Nothing of evidentiary value was found on the computer

hard drives.  In addition, the FBI photographed various documents, papers, letters, notes, and

items located inside the residence.  Specifically, the FBI observed financial information including

a 2005 W-2 tax form from Pizza Hut that showed income in the amount of $9,756.66 and an IRS

document showing income of $6,280.00.

78.    During the December 15, 2007, court authorized search, the FBI photocopied

and/or videotaped various papers, documents, letters, and notes, including the aforementioned

pocket notebook that FBI agents photocopied at the George Bush Intercontinental Airport in

Houston, Texas.  Agents also observed in plain view a Bible with approximately thirty-five one

hundred dollar bills loosely laying in it.  A review of the notebook indicated that several pages

that referenced NICHOLSON and the questions the Russians have regarding how he may have been discovered, had been removed since NATHANIEL arrived back on December 13. Sheridan visitation records indicate that NATHANIEL visited his father at Sheridan on December 15, 2007. It is unknown if NATHANIEL passed any of this information on to NICHOLSON while at that visit.

79.     During the December 6, 2008, court authorized search, the FBI photocopied and/or videotaped various papers, documents, letters, and notes, including a receipt showing that NATHANIEL had paid $1,634.41 in cash for "Airline Tkts" [sic]. Agents also photocopied and/or videotaped a travel itinerary that showed the travel plans for NATHANIEL set forth above as well as a reservation confirmation for Cyprus Hilton in Nicosia, Cyprus, from December 10, 2008, ending December 14, 2008. Agents also found $294 in U.S. currency inside a Delta ticket jacket that contained receipts for NATHANIEL's trip, the composition notebook discussed extensively above and a post-it note on NATHANIEL's refrigerator that I believe was a packing list for NATHANIEL's trip to Cyprus. The post-it listed the following items: Bible, hat, bag, Kanokwan's info, tickets, PSP w/games, IPOD, clothes, alarm clock, Dad's letter, passport, school schedule. I believe that "Dad's letter" was a reference to the letter dated August 31, 2008, that is discussed in detail above.

## Oregon License Plate D/2 0516, a 2005 Chevrolet Cavalier

80.     Oregon license plate D/2 0516, Vehicle Identification Number 1G1JF52F857110139, a Blue 2005 Chevrolet Cavalier, is registered to Nathaniel J. Nicholson. Physical surveillance has observed NATHANIEL driving this vehicle to and from his residence on multiple occasions.

81.     The FBI previously conducted court authorized physical searches of NATHANIEL's 2005 Chevrolet Cavalier on October 13, 2007, in Redmond, Oregon; December 5, 2007, in Eugene, Oregon; December 10, 2007, at Portland's International Airport, Portland, Oregon; January 5, 2008, in Eugene, Oregon; and, on December 8, 2008, at Portland's International Airport, Portland, Oregon.  During the December 5, 2007, search the FBI located a letter in the glove box dated September 23, 2007, from NICHOLSON addressed to NATHANIEL at **4815 Unthank St., Apt 388, Eugene, Or, 97402**.  In the body of the letter appeared the name, address and banking information pertaining to NICHOLSON's girlfriend Kanokwan in Thailand.  Also observed in the glove box was a business size envelope that had "Anastassia (or Anastassia) Alexandrovna SUvbotina, 21-48 Kdykov St., Cheboksary, Russia 428037," hand written on the back.  During the December 10, 2007, search the same items were observed in addition to a cellular telephone located in the glove box.  During the December 8, 2008, search agents found NATHANIEL's cellular telephone.

### NICHOLSON's prison cell FCI Sheridan, Oregon

82.     On December 10, 2008, I confirmed with SIS Lieutenant Debra Payne, at FCI Sheridan that HAROLD JAMES NICHOLSON is currently housed at **FCI Sheridan, Oregon, Unit 4B, Cell 205L.**  I have been advised that NICHOLSON currently shares this cell with Kyle Minchey Inmate # 12869-081.

### NATHANIEL NICHOLSON

83.     NATHANIEL NICHOLSON is described as a white male, five feet, eight inches tall, bald head, approximately 155 lbs, date of birth July 31, 1984.

84.    On December 8, 2008, Transportation Security Administration (TSA) Behavioral
Detection Officer Mark Burmeister conducted a court authorized general inventory of
NATHANIEL's person and his belongings as he passed through security at Portland International
Airport en route to Cyprus.  Officer Burmeister briefly looked through NATHANIEL's backpack
and wallet and conducted a pat-down of his person.  According to Burmeister, NATHANIEL's
backpack contained miscellaneous clothing, a portable alarm clock, a portable Playstation device
(PSP), and an Apple Ipod.  NATHANIEL's wallet contained credit cards - including one issued
to his brother Jeremi Nicholson - and an undetermined amount of United States currency.
NATHANIEL was also carrying a small composition notebook.  Although Officer Burmeister
attempted to be thorough, he did not locate any letters.  During the inventory of NATHANIEL's
property, TSA BDO Manager Donald Headrich interviewed NATHANIEL.  NATHANIEL told
Headrich that he was traveling to Cyprus to meet his "Battle Buddy" and that he was planning on
touring several castles while he was on the island.

### 1699 North Terry Street, Space 161, Eugene, Oregon  97402.

85.    On December10, 2008, utility information check disclosed that Marvin C.
Nicholson and Beatrice M. Nicholson are the customers at 1699 North Terry Street, Space 161,
Eugene, Oregon 97402.  On December 8, 2008, surveillance observed a maroon Toyota parked in
the driveway registered to Beatrice and Marvin Nicholson at 1699 North Terry Street, Space 161,
Eugene, Oregon 97402.  Public records from Qwest Communications indicate that the home
telephone number for Marvin Nicholson is 541-461-2670, at 1699 North Terry Street, Space 161,
Eugene, Oregon.

/////

## COUNTERINTELLIGENCE INVESTIGATIONS

86.      Based on my training and experience, and that of other FBI personnel with whom I have consulted, and on my participation in this investigation, I know that:

A.      Persons who have engaged in espionage activities on behalf of foreign intelligence services and persons who knowingly assist those engaged in espionage activities, maintain records, notes, bank records, financial statements, calendars, journals, maps, instructions, relating to the transmittal of information to and from foreign governments and intelligence services. Such records, notes, bank records, financial statements, calendars, journals, maps, instructions and other papers or documents are maintained and often hidden on their persons, in their automobiles and in and around their residences, or of the residences of trusted associates who are aware of their espionage activity.

B.      Persons who have been engaged in espionage activities on behalf of foreign intelligence services and persons who knowingly assist those engaged in espionage activities, often utilize espionage paraphernalia, including devices designed to conceal and transmit classified intelligence information. These paraphernalia and devices include materials used by espionage agents to communicate between each other and with a foreign government, to wit: coded pads, books, records, documents and papers in addition to other sophisticated espionage tradecraft materials. Because of NICHOLSON's incarceration, he only has access to the limited means of communication that are allowed in Bureau of Prisons facilities, including personal visits, letters and telephonic communications. I believe that he uses these methods to communicate with NATHANIEL who carries out his direction and the directions of the Russian handlers.

43

C.　　Persons who have engaged in espionage activities on behalf of foreign intelligence services and persons who knowingly assist those engaged in espionage activities, routinely conceal in their residences or the residences of trusted associates aware of their criminal conduct, large amounts of currency and other items of value and/or proceeds of illegal espionage transactions. They also conceal records relating to hidden foreign and domestic bank accounts and financial records, including accounts in fictitious names. I believe that NATHANIEL may be making efforts to conceal the money he is collecting on behalf of his father, either in foreign banks accounts, by collecting the money in foreign currency (Euros) as NICHOLSON advised in the August 31, 2008, letter to NATHANIEL, or at the residence of Betty and Marvin Nicholson.

D.　　Persons who have been engaged in espionage activities on behalf of foreign intelligence services and persons who knowingly assist those engaged in espionage activities, often conceal important documents or materials, as well as clandestine communications instructions, contact instructions, codes, telephone numbers, maps, photographs, other papers and materials relating to communications procedures in secure hidden locations and compartments within their residences and vehicles or in residences or vehicle of trusted associates aware of their criminal activity.

E.　　Persons who have been engaged in espionage activities on behalf of foreign intelligence services, and persons who knowingly assist those engaged in espionage activities, are not unlike any other person in our society in that they maintain documents and records, often doing so for long periods of time, regardless of whether their value to the person has diminished. These persons maintain documents and records that will identify and corroborate travel both in the United States and abroad made in connection with contact with foreign intelligence officers.

44

Such documents include passports, visas, calendars, journals, date books, telephone numbers, credit cards, hotel receipts, airline records, correspondence, copies of money orders and cashier's checks and accounts and records in fictitious names.

      F.      Persons who have been engaged in espionage activities on behalf of foreign intelligence services and persons who knowingly assist those engaged in espionage activities, often maintain identity documents, including those utilizing fictitious identities, United States foreign currency, instructions, maps, photographs, United States and foreign bank accounts access numbers and instructions, and other papers and materials relating to emergency contact procedure and escape plan.

      87.     The records, instructions, maps, photographs, documents and other items described above may be held in paper or electronic form. The electronic form can be on a computer hard drive or on a storage medium such as diskettes or CD ROMS. In addition, the investigation has already revealed that NATHANIEL has used and has been instructed to use electronic communications to communicate with his Russian handlers. The investigation has also showed that NATHANIEL has used his personal computer located at **4815 Unthank Avenue, Apartment 388, Eugene, Oregon 97402,** to research possible flights to Cyprus.

      88.     Based upon my training and experience, and that of other FBI Special Agents, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a controlled environment. This is based upon: 1) the volume of evidence that can be stored on computer storage devices; 2) the technical requirements to search a computer require expert skill and a properly controlled environment, and; 3) the requirement

that most or all of the computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) be seized so a qualified expert can accurately retrieve the system's data in a controlled environment. Therefore, I hereby request the Court's permission to seize any computer hardware (and associated peripherals), that are believed to contain some or all of the evidence described in the warrant, and to conduct and off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware onsite for this evidence.

89.    Based upon my training and experience, and that of other FBI Special Agents, I believe that the original computer and data storage media constitute evidence and should be retained by my agency. The original is necessary to address questions that may be raised about the authenticity of any document or other data extracted from the storage devices. If the items seized do not fall within those authorized by the Court, the government will return these items within a reasonable period of time not to exceed 60 days from the date of seizure unless further authorization is obtained from the Court.

90.    The results of previous court authorized searches of NATHANIEL's apartment and automobile that are described above also demonstrate that NATHANIEL has retained evidence of his communication with a foreign government of behalf of his father to collect moneys owed for NICHOLSON's past espionage activity and it is clear that such activity is ongoing in anticipation of the meeting in Cyprus on December 10, 2008.

91.    Based upon the above information, there is probable cause to believe that NATHANIEL JAMES NICHOLSON and his father HAROLD JAMES NICHOLSON have

committed violations of Title 18, United States Code, § 951, Unregistered Agent of a Foreign

Government; and of Title 18, United States Code, §1956(a) and (h), Conspiracy to Commit

Money Laundering.

92.    Therefore, based upon the facts contained in this Affidavit and Application, there

is probable cause to believe that evidence of the above violations, more particularly described in

Attachments 1, 2 and 3, exists at:

A)    The residence of Nathaniel James Nicholson, located at Heron Meadows

Apartments, 4815 Unthank Avenue,  Apartment 388, Eugene, Oregon, 97402.

B)    A Blue 2005 Chevrolet Cavalier, bearing Vehicle Identification Number

1G1JF52F857110139, Oregon License D/2 0516, registered to Nathaniel J.

Nicholson, 4815 Unthank Avenue, Apartment 388, Eugene, Oregon, 97402.

C)    The person of Nathaniel James Nicholson, who is a white male, height 5'8,

approximately 155 lbs, date of birth July 31, 1984.

D)    Federal Correctional Institute, Sheridan, Oregon, Unit 4B, Cell 205L, occupied by

Harold J. Nicholson and cellmate Kyle Minchey # 12869-081.

E)    The residence of Marvin C. Nicholson and Beatrice M. Nicholson located at 1699

North Terry Street, Space 161, Eugene, Oregon 97402.

/////

/////

47

93.     This affidavit has been reviewed and approved for presentation by Assistant United States Attorneys Pamala R. Holsinger and Ethan D. Knight, and Patrick Murphy, Trial Attorney, Counterespionage Section, United States Department of Justice, Washington, D.C., who concur there is probable cause to search the listed locations and vehicle.


JARED J. GARTH
Special Agent
Federal Bureau of Investigation


Subscribed and Sworn to before me this ____ day of December 2008.


THE HONORABLE PAUL PAPAK
UNITED STATES MAGISTRATE JUDGE

48